UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JEFFREY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:10-cv-00980 (AJT/IDD) |
| | ) |
| ALAN GILNER, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

This case was tried without a jury on April 26, 2012, following which the Court took the matter under advisement and now issues its decision and findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

In this action, plaintiff Jeffrey Brown ("Brown" or "Plaintiff"), claims that he was defrauded in a Ponzi scheme by defendants Randi Bochinski and Alan Gilner. Brown alleged four claims: (1) Fraud and Fraud in the Inducement (Count I); (2) Racketeering Influenced and Corrupt Organizations Act ("RICO") (Count II); (3) Civil Conspiracy (Count III); and (4) Intentional Infliction of Emotional Distress (Count IV). Defendant Gilner generally and conclusorily responded to the Complaint in a letter, but otherwise never properly answered or responded substantively to the allegations against him. Bochinski never answered the Complaint and the Clerk entered default against him.[1]

The case against Gilner proceeded to trial without a jury, at which Gilner did not appear. For the reasons stated herein, the Court concludes that defendant Gilner is liable under Counts I, II, and III, and that judgment should be entered against him in the amount of $1,190,000 on

---

[1] Plaintiff filed a motion for default judgment against Bochinski, which the Court denied pending the outcome of the case on the merits against Gilner. [Doc. No. 104].

1

Count I, $6,555,000 on Count II, and $2,185,000 on Count III. The Court concludes that Plaintiff failed to prove against defendant Gilner his claim for intentional infliction of emotional distress, asserted in Count IV, or his claim for punitive damages.

## I. **Introduction**

On August 27, 2010, Brown, appearing *pro se*, filed a Complaint against Bochinski and Gilner in this Court. (Doc. No. 1.) On December 6, 2010, after his request for a default judgment was denied based on the inadequacy of the Complaint, Plaintiff filed an Amended Complaint. (Doc. No. 21.) Thereafter, Plaintiff moved for default judgment based on Defendants' failure to appear or defend. On May 20, 2011, the Magistrate Judge recommended Plaintiff's motion for default judgment be denied because, again, the Amended Complaint, like the initial Complaint, failed to set forth sufficient factual allegations to state a claim upon which relief may be granted. (Doc. No. 40.) Plaintiff timely filed objections to the Magistrate Judge's Report and Recommendation, which the Court overruled. (Doc. Nos. 41 and 47.)

On July 11, 2011, Plaintiff retained counsel. (Doc. No. 48, at 2.) On September 21, 2011, Plaintiff filed his Second Amended Complaint seeking relief based on claims for fraud and fraud in the inducement, RICO, civil conspiracy, and intentional infliction of emotional distress. (Doc. No. 56.)[2] On October 24, 2011, Gilner filed a letter which the Court construed as an answer to the Complaint for the purposes of avoiding a default. (Doc. No. 58.) Later, Gilner requested the Court appoint him an attorney to defend the lawsuit, which the Court denied. (Doc. Nos. 69 and 84.) On March 15, 2012, the Court held a final pretrial conference, which Gilner failed to attend. The Court set a trial date at that conference for April 26, 2012. On April 26, the trial proceeded and Gilner failed to appear. After receiving evidence, the Court took the matter under

---

[2] For ease of reference, the Court will refer to this filing as the "Complaint" because it is the operative document.

2

advisement. At trial, the Court noted that Gilner's answer was "grossly inadequate" in that it failed to admit or deny the allegations in the Complaint and merely made a general, two-page denial. For this reason, the Court deemed the factual allegations in the Complaint as true. *See* Fed. R. Civ. P. 8(b)(6) ("An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied."). Based on that admission as well as the other evidence presented at the trial, the Court now issues its findings of fact and conclusions of law.

## II. **Findings of Fact**

At some point in time, Gilner advertised a "high yield investment program" in the Oxford Club newsletter, which was an investor newsletter that was distributed throughout the United States. Compl. ¶ 4. At some time prior to January 21, 2005, Plaintiff contacted Gilner for more information regarding the investment program advertised in the Oxford Club newsletter. Compl. ¶¶ 5-6. In response, Gilner emailed Plaintiff a document for him to sign, acknowledging his interest in learning more about the investment program and agreeing to keep such information confidential. Compl. ¶ 6. Thereafter, Gilner and Plaintiff met. Compl. ¶ 7. At this initial meeting, Gilner promised large returns on Plaintiff's investments and a 100% secured principal amount, effectively inducing Plaintiff to invest in the program. Compl ¶ 7.[3] After the initial meeting, Gilner again contacted Plaintiff by email and telephone to encourage him to invest. Compl. ¶ 8. Gilner represented that he was a part of the Old Navajo Foundation. Trial Transcript 19 ("Tr."); Compl. ¶¶ 7-8.

---

[3] More specifically, Gilner told Plaintiff that all principal amounts would be kept safe and remain in an escrow account, which would be 100% secured by insurance and performance bonds. Compl. ¶ 27. Plaintiff was further assured that the principal amounts would be returned to him within one or two years, depending on the contract. Compl. ¶ 27. Moreover, Plaintiff was told that he would receive a guaranteed monthly return of 4% in interest on his investments. Compl. ¶ 27.

On January 21, 2005, Plaintiff wired $250,000 to Gilner to participate in the investment program. Compl. ¶ 9. On April 1, 2005, Plaintiff wired an additional $1,000,000 to Gilner, which also was intended to be an investment in the Old Navajo Foundation. Compl. ¶ 10; Ex. 6. Plaintiff wired these funds with the understanding that Gilner would manage the funds and that, as advertised, he would receive a monthly 4% return on his investment. Compl. ¶ 10. After wiring the funds, Plaintiff received an email from Gilner confirming receipt of the funds and welcoming Plaintiff into the Old Navajo Foundation. Compl. ¶ 11.

Later in 2005, Plaintiff was introduced to Bochinski by Gilner. Bochinski represented that he was the principal of the Old Navajo Foundation. Compl. ¶ 12. At Gilner's suggestion, Plaintiff travelled to Vancouver to meet Bochinski. After that meeting, Bochinski solicited additional funds from Plaintiff through email, telephone, and in-person, promising him higher returns on additional investments. Compl. ¶¶ 12, 14. Gilner also personally encouraged Plaintiff to invest further with Bochinski. Tr. 28. Shortly thereafter, Plaintiff wired approximately $945,000 directly to Bochinski for such investments. Compl. ¶ 14.

Aside from the Old Navajo investments, Bochinski told Plaintiff that he was organizing a $1,000,000 deal, which was referred to as "the Carlant Deal." Compl. ¶ 17. Bochinski represented that the Carlant Deal would consist of four investors, each investing $250,000, and that each would receive returns of between eight and ten times their principal within ninety days. Compl. ¶ 17.[4] Further, Plaintiff was told that no funds would be released from the escrow account without his prior express authorization. Compl. ¶ 17. On June 29, 2005, after receiving both verbal and written representations from Bochinski regarding this new deal, Plaintiff wired

---

[4] More specifically, "Bochinksi represented that the $1,000,000 total investment would be placed in an escrow account and that the funds would be leveraged as collateral to secure loans, the proceeds of which loans would be traded in international banks." Compl. ¶ 17.

4

$50,000 to Bochinski to be included in the Carlant Deal. Compl. ¶ 18. Overall, Plaintiff sent $995,000 directly to Bochinski.

Between March 2005 and May 2007, Gilner transferred Plaintiff's investment funds from Old Navajo to bank accounts owned by Bochinski. Compl. ¶ 15. Plaintiff discovered the transfer at some point, but was told the funds were transferred to Bochinski as the administrator of the Old Navajo Foundation's investment program. Compl. ¶ 13. However, after receiving Plaintiff's funds, Gilner and Bochinski diverted the funds for uses other than the stated investments. Compl. ¶ 23. In some measure, Defendants used Plaintiff's funds to pay for their own business and personal expenses. Compl. ¶ 25. Bochinski also transferred the funds from the Carlant Deal to his personal bank account without prior authorization from the investors. Compl. ¶¶ 19-20.

Unbeknownst to Plaintiff at the time, Gilner and Bochinksi were actually operating a "Ponzi scheme," whereby they encouraged Plaintiff and others to invest into fraudulent high-yield investment vehicles that never existed. Compl. ¶¶ 24, 43. As is typical of most Ponzi schemes, Defendants solicited investment funds from Plaintiff and others, paying returns to old investors with such new funds to create the appearance that the investments were legitimate and profitable. Compl. ¶ 24. Under this false pretense, Plaintiff and others were lulled into investing additional funds into such fraudulent investment vehicles. Compl. ¶ 24. Gilner and Bochinksi also regularly mailed and emailed Plaintiff confirmations, account statements, and updates, indicating that his investments were safe and making profits. Compl. ¶ 28. At times, Plaintiff would receive correspondence from a "Peter Carson"; however, Peter Carson is a "figment" and all documents supposedly signed by him were actually forgeries committed by Bochinski. Compl. ¶ 29. In fact, all the statements received by Plaintiff were intentional fabrications. Compl. ¶ 29. While Plaintiff testified that he trusted Defendants because "payouts were

occurring on a regular basis," the only evidence of a payout was $60,000 that Plaintiff withdrew in 2005. *See* Tr. 25, 32; Ex. 9.[5] That payout came from the $1,000,000 investment he made at Gilner's behest. *See* Tr. 25-26.

Eventually, Plaintiff discovered the fraud and confronted Defendants. Compl. ¶ 37. Either prior to or after such discovery, Bochinski emailed assurances to Plaintiff on October 10, 2007, October 12, 2007, November 1, 2007, March 12, 2010, and April 21, 2010 that his funds would be returned to him shortly. Compl. ¶ 27. However, Gilner and Bochinksi never returned the funds. Additionally, on July 17, 2009, in an attempt to further placate Plaintiff and to prevent him from initiating legal action against Bochinski, Gilner offered to pay off Plaintiff's credit cards and mortgage, but never did. Compl ¶ 37. The funds that Plaintiff invested were never returned to him. In all, Plaintiff invested $2,245,000 with Gilner and Bochinski, and received only $60,000 in return.

On August 27, 2010, Plaintiff filed suit against Gilner and Bochinksi.[6]

### III. Conclusions of Law

Plaintiff has alleged four separate causes of action based on these facts: Count I: Fraud and Fraud in the Inducement; Count II: RICO; Count III: Civil Conspiracy; and Count IV: Intentional Infliction of Emotional Distress. Plaintiff seeks statutory damages, compensatory damages, punitive damages in the amount of $24,000,000, interest, and reasonable attorney's fees and costs. The Court addresses each Count, and the relief sought, in turn.

---

[5] The Complaint is also unclear whether Plaintiff received any of the promised returns, and if so, how much. Plaintiff alleges that "the promised returns were not consistently paid." Compl. ¶ 44. This statement suggests that some returns were paid to Plaintiff, but no other mention is made throughout the rest of the Complaint.

[6] Federal criminal charges are also currently pending against Defendants in the United States District Court for the District of Massachusetts

### *Count I: Fraud and Fraud in the Inducement*

To state a claim for actual fraud under Virginia law, Plaintiff must prove, by clear and convincing evidence, the following six elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994). Under these elements, a finding of actual fraud "requires clear and convincing evidence that one has represented as true what is really false, in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this representation." *Id.* In Virginia, a claim of fraud "must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *McMillion v. Dryvit Sys., Inc.*, 262 Va. 463, 471 (2001) (internal quotation marks omitted). Nevertheless, "if a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud." *Supervalu, Inc. v. Johnson*, 276 Va. 356, 368 (2008).

The Court finds that both Gilner and Bochinksi misrepresented the substance of the investment that they solicited from Plaintiff and also lacked the intention of performing their promises to invest Plaintiff's money as they said they would, because they knew that the proffered investments did not even exist. *See Station # 2, LLC v. Lynch*, 280 Va. 166, 172 (2010); *see also Albayero v. Wells Fargo Bank, N.A.*, No. 3:11cv201-HEH, 2011 WL 4748341, at *4 (E.D. Va. Oct 05, 2011). The Court further finds that Bochinski's and Gilner's statements to Plaintiff were knowingly false and material, and relied upon by Plaintiff. For example, there appears to have been no basis in fact for any statement that Plaintiff's nearly $2.2 million investment in Old Navajo Foundation and related ventures would be safe because the principal

would be 100% secured by insurance and performance bonds, the principal would remain in an escrow account, and the Plaintiff would receive a guaranteed monthly 4% return. *See* Tr. 15-18. Likewise, the representations that Bochinski made related to the Carlant Deal—that any investment would pay out between eight and ten times its principal and that any investments would be placed in an escrow account—were false, material, knowing, and relied upon by Plaintiff. Bochinski took those funds, including the $50,000 that Plaintiff provided, out of escrow and used them elsewhere instead of investing them in the Carlant Deal, which itself never existed as Plaintiff learned.

With respect to compensatory damages, the Court finds that Plaintiff invested as a result of Defendants' fraud the sums of $250,000, $1,000,000, $945,000, and $50,000 and received one $60,000 withdrawal from his $1,000,000 investment. Therefore, the Court concludes that Plaintiff has suffered $2,185,000 in actual loss as a result of Defendants' fraud.[7] However, only $1,250,000 can be attributable directly to Gilner's fraudulent conduct, less the $60,000 withdrawal, with the rest attributable to Bochinski's conduct, even though the two clearly worked together, as discussed *infra*.

With respect to punitive damages, it is unclear whether Plaintiff seeks punitive damages under his fraud claim, or merely under his intentional infliction of emotional distress claim. *See* Tr. 43-44; Proposed Findings 18-19. In order to award punitive damages in a fraud action, the Plaintiff must prove "malice." *Jordan v. Sauve*, 219 Va. 448, 451-52 (1978); *Job American Mgmt. Export Import – N.C., Ltd. v. Kaltone Petroleom Mktg. Corp.*, No. CIV. A. 4:99CV24, 1999 WL 33228367, at *6 (E.D. Va. Dec. 10, 1999). Malice is demonstrated by "ill will, malevolence, grudge, spite, wicked intention or a conscious disregard of the rights of another."

---

[7] Plaintiff's counsel calculated the amount of investment at $2,150,000. Tr. 44. After reviewing the evidence presented, the Court independently calculates the amount at $2,195,000.

*Lee v. Southland Corp.*, 219 Va. 23, 27 (1978); *Kaltone*, 1999 WL 33228367, at * 6; *see also Sit-Set, A.G. v. Universal Jet Exchange, Inc.*, 747 F.2d 921, 928 (4th Cir. 1984) ("Virginia does not permit recovery of punitive damages except upon proof of a degree of aggravation in the critical state of mind above the threshold level required to establish liability for compensatory relief."). The Court finds that there is insufficient evidence to support a claim for punitive damages against Gilner and will award Plaintiff $1,190,000 against Defendant Gilner for the fraudulent behavior that is directly attributable to Gilner.

### *Count II: RICO*

The Plaintiff also brings a claim under RICO. Pursuant to RICO, 18 U.S.C. § 1964, "[a]ny person injured in his business or property by reason of violation of § 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains, and the cost of suit . . . ." 18 U.S.C. 1964(c). There are four sub-provisions under § 1962 that describe conduct that constitutes a RICO violation. 18 U.S.C. §§ 1962(a)-(d). Plaintiff asserts that his claim arises under § 1962(c), which states,

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). A plaintiff bringing claims under § 1962(c) must prove that defendants were persons who (1) conducted an enterprise (2) through a pattern (3) of racketeering activity (4) and that such conduct caused injury to plaintiff's business or property. *Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997).

With respect to the first element, the plaintiff must "show an enterprise, which is defined as an ongoing organization, formal or informal, in which the various associates function as a continuing unit." *Palmetto*, 117 F.3d at 148 (citing *United States v. Turkette*, 452 U.S. 576, 583

(1981)); *see also* 18 U.S.C. § 1961(4) (defining "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."). As such, the "enterprise must be distinct from the persons alleged to have violated 1962(c)." *Palmetto*, 117 F.3d at 148. Plaintiff contends that the Old Navajo Foundation and Carlant Deal were two enterprises and that Gilner and Bochinski are the persons "employed by or associated with" those enterprises. *See* 18 U.S.C. § 1962(c). Though Gilner and Bochinski are themselves the operators of the Old Navajo Foundation and the Carlant Deal, they are being sued in their individual capacities; Plaintiff is not alleging a RICO claim against the "enterprises" themselves. *See, e.g., New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1163-66 (4th Cir. 1994) (affirming dismissal of a RICO claim where the plaintiff alleged that the defendant union was both the "person" and the "enterprise."). Therefore, the Court concludes that Plaintiff has adequately proven this element.

The second and third elements require a showing that "at a minimum, each RICO defendant committed two acts of racketeering activity within a ten-year period." *Palmetto*, 117 F.3d at 148. "Racketeering activity" is defined to include, among other activities, mail fraud and wire fraud. 18 U.S.C. § 1961(1)(B). The Fourth Circuit has explained that "[t]he offenses of mail and wire fraud require use of the mails or wires with the intent to defraud." *Morley v. Cohen*, 888 F.2d 1006, 1010 (4th Cir. 1989). The key issue, in the context of a RICO claim, "is whether the communication occurred 'for the purpose of executing the scheme.'" *Id.* (quoting *Kann v. United States*, 323 U.S. 88, 94 (1944)). Here, the evidence shows that Defendants mailed documents to Plaintiff as well as emailed with Plaintiff many times. *See* Ex. 1 (newsletter mailed to Plaintiff advertising the investment opportunity); Ex. 2 (email from Gilner confirming

deposit of $250,000); Ex. 3 (letter from "Peter Carson" confirming deposit of $250,000); Ex. 5 (fax from Gilner with attached tax-related document); Ex. 6 (email from Gilner confirming deposit of $1,000,000); Ex. 7 (letter from "Peter Carson" confirming deposit of $1,000,000); Ex. 9 (letter from "Peter Carson" outlining interest earned on investment); Ex. 10 (email from Gilner). These correspondence, both over wire and mail spanned from 2005 to 2009. And, importantly, "it is settled that each mailing or wire transmission in furtherance of the fraud scheme constitutes a separate offense, and it may be separately punished." *United States v. Jefferson*, 674 F.3d 332, 367 (4th Cir. 2012). Therefore, Gilner committed many acts of mail and wire fraud.

In order to prove that related mail and wire frauds constitute a sufficient "pattern of racketeering activity," a plaintiff must show more than simply two violations in a ten-year period. RICO is "a unique cause of action that is concerned with eradicating organized, long term, habitual, criminal activity." *US Airline Pilots, Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)). Therefore, to demonstrate a sufficient "pattern" of racketeering activity, a plaintiff must show 'continuity plus relationship,' i.e. 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Id.* (quoting *H.J. Inc. v. NW Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Here, the various mail and wire frauds in this case are related;[8] the only issue is whether those acts (1) amount to continued criminal activity or (2) pose the threat of continued criminal activity. This "continuity" sub-element "is both a closed- and open-ended concept, referring either (1) to a closed period of repeated conduct, or (2) to past conduct that by its nature

---

[8] The Supreme Court has explained that relatedness requires proof that the racketeering acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240. The evidence clearly demonstrates that the various acts of mail and wire fraud satisfy this definition.

projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 239) (numbers added). Defendants' conduct falls within the definition of a "pattern" with closed-end continuity.

Closed-end continuity occurs when "the series of related predicates extend[s] over a substantial period of time." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242). In finding a pattern based on closed-end continuity, courts must be "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood ex rel Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). It is therefore important "to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Id.* Central to this analysis is whether there was no evidence or allegations of other individuals harmed by the RICO conduct. *Id.* (holding that a fraud-based RICO action was inappropriate when there was only one victim of the scheme, though the scheme spanned several years, because such a scheme is insufficient to establish a "pattern"); *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (same); *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 274 (4th Cir. 2010). In short, a RICO claim fails if it does not "rise above the routine, and does not resemble the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties." *Flip*, 841 F.2d at 538. Here, the evidence shows that Defendants' scheme goes far beyond just the Plaintiff; the scheme affected other investors and victims, including Plaintiff's friends, making a RICO claim against Defendants appropriate. *See* Tr. 36-39

The last element requires a showing of damages. Here, the Court has already determined that Plaintiff has suffered a total of $2,185,000 in damages due to Defendants' fraudulent

activities. For the same reasons, the Court concludes that Plaintiff sustained compensatory damages in the amount of $2,185,000 as a result of defendants' RICO violation. Nevertheless, the Court must consider whether Plaintiff should also be awarded treble damages. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter . . . shall recover threefold the damages he sustains and the cost of the suit."); *US Airline Pilots*, 615 F.3d at 317 ("The Supreme Court has described the penalties authorized by RICO as 'drastic.' . . . [A] successful plaintiff may recover not only costs and attorney's fees, but also *treble* damages."). No further showing is required for this purpose and pursuant to RICO's specific authorization of treble damages, Plaintiff is entitled to $6,555,000. The Court will abstain from ruling on any attorney's fees at this time, as there is no evidence currently before the Court that would permit an adjudication of that issue.

### *Count III: Civil Conspiracy*

Plaintiff next asserts the tort of civil conspiracy. "A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Country of Vintner, Inc. v. Louis Latour, Inc.*, 272 Va. 402, 412 (2006) (quoting *Commercial Bus. Sys. v. BellSouth Servs.*, 249 Va. 39, 48 (1995)).[9] "The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy." *BellSouth*, 249 Va. at 48.

There is ample evidence that Gilner and Bochinski worked together. Plaintiff first worked with Gilner to begin investment in the Old Navajo Foundation, who then introduced Plaintiff to Bochinski; Plaintiff later discovered that Bochinski was in charge of the Old Navajo

---

[9] In his Proposed Findings, Plaintiff cites to *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703-04 (E.D. Va. 2007) as the basis for his conspiracy claim. That case discussed a common-law conspiracy as opposed to a statutory conspiracy under Virginia law. Proposed Findings 15. Therefore, the Court will analyze this claim as a common-law conspiracy.

Foundation. Tr. 26-27. Plaintiff invested his money through both Gilner and Bochinski and, when the investments were not paid back, Gilner tried to persuade Plaintiff not to file suit against Bochinski, offering to be the "facilitator" of a settlement between the two. Tr. 34-35; Ex. 10. Based on all the evidence and the reasonable inferences therefrom, the Court finds and concludes that Defendants entered into an agreement for an unlawful purpose, the defrauding of investors, that Gilner knowingly participated in the conspiracy, and that Plaintiff was defrauded as a result of the conspiracy. *See Almy v. Grisham*, 273 Va. 68, 80 (2007) ("[I]n Virginia, a common claim of civil conspiracy generally requires proof that the underlying tort was committed."); *Terry v. SunTrust Banks, Inc.*, Nos. 11-1704, 11-1707, 2012 WL 2511066, at *9 (4th Cir. July 2, 2012) ("The 'unlawful act' element requires that a member of the alleged conspiracy have 'committed' an 'underlying tort.'"). As to damages, the Court finds and concludes, for the reasons previously stated, that Plaintiff suffered damages as a result of the conspiracy in the amount of $2,185,000. As a participant in the conspiracy, those damages are assessable against Gilner, whether caused directly by Bochinski's statements and conduct or his own.

### *Count IV: Intentional Infliction of Emotional Distress*

Finally, Plaintiff seeks to hold Gilner liable for the tort of intentional infliction of emotional distress ("IIED"). To state a claim, Plaintiff must allege "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Ogunde v. Prison Health Servs., Inc.*, 274 Va. 55, 65 (2007) (internal quotation marks and citation omitted); *see also Womack v. Eldridge*, 215 Va. 338, 342 (1974). Virginia courts have, however, repeatedly emphasized that the tort of IIED is "not favored" in the law. *Supervalu*, 276 Va. at 370 (citing *Almy*, 273 Va. at 77); *Harris v.*

14

*Kreutzer*, 271 Va. 188, 203-04 (2006); *Russo v. White*, 241 Va. 23, 26 (1991); *Ruth v. Fletcher*, 237 Va. 366, 373 (1989)). This is because "there are inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury." *Id.* A claim for IIED requires proof by clear and convincing evidence. *Supervalu*, 276 Va. at 370.

The first "element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result." *Womack*, 215 Va. at 342. Although there is no direct evidence that Gilner or Bochinksi had the specific intent to cause Plaintiff emotional distress, given their intent to defraud, the long-term relationship that Gilner had with Plaintiff, and the amount of money that Plaintiff lost, Gilner should have known that emotional distress would likely result.

The second element requires Plaintiff to show that Gilner's conduct was "so outrageous in character, and so extreme in degree, as to be regarded as atrocious, and utterly intolerable in a civilized community." *Ostolaza-Diaz v. Countrywide Bank, N.A.*, 360 F. App'x. 504, 507 (4th Cir. 2010) (quoting *Russo*, 241 Va. at 26). Mere tortious or criminal conduct is not enough. *Russo*, 241 Va. at 27. "The question whether the defendant's conduct is so extreme and outrageous as to permit recovery is a question of law for the court." *Hatfill v. New York Times Co.*, 416 F.3d 320, 336 (4th Cir. 2005) (citing *Womack*, 215 Va. at 342). This element reduces to whether Defendants' fraud scheme is extreme and outrageous in the context of this disfavored tort. As the Supreme Court of Virginia has explained within the context of a defrauded business, the "tort is directed at prohibiting conduct intended to cause personal, emotional damage to an individual, rather than conduct intended to cause economic damage to a business." *Supervalu*, 276 Va. at 371. And "[a]lthough a person may be so closely associated with the operation of a

business that economic damage to that business may result in damage to the individual's emotional state, the tort of intentional infliction of emotional distress does not encompass such personal consequences of business conduct." *Id.* While Gilner and Bochinski no doubt intended to swindle Plaintiff via their fraudulent investment vehicles, that conduct is not the type of personal economic damage that the tort is intended to target. Gilner and Bochinski engaged Plaintiff in business dealings and not personal attacks, and therefore their conduct does not qualify as "outrageous" under the tort's standard.

However, even if Plaintiff could establish the second element, the third and fourth elements, requiring severity of the distress caused by the Defendants' actions, have not been established by clear and convincing evidence. As examples of his severe emotional distress, Plaintiff alleged in the Complaint that he has lost all of his life savings, he lost the companionship of friends and family whom he encouraged to also invest and who now blame him for their losses, he is struggling to keep his house from being foreclosed on, his marital life has been negatively impacted, he suffers from severe depression, stress, nervousness, sleeplessness, and inability to concentrate, and that he has experienced exacerbation of back and neck pain severe enough to put him on disability. Compl. ¶¶ 67-70. Essentially, "[e]very aspect of Plaintiff's life has been severely altered" due to the emotional distress caused by Defendants' conduct. Compl. ¶ 70. Plaintiff's testimony confirmed these symptoms and, in his testimony, he testified further that because of Defendants' actions, he no longer exercises regularly, now weighs 50 pounds more than before, and has high blood pressure. He also testified that he "snaps" at his family members and prefers to be alone.

The Virginia Supreme Court has emphasized that liability for intentional infliction of emotional distress "arises only when the emotional distress is extreme, and only where the

distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*, 241 Va. at 27. *See also Harris*, 271 Va. at 205 (citing *Russo*, 241 Va. at 28) ( "[A] plaintiff complaining of nervousness, sleep deprivation, stress and its physical symptoms, withdrawal from activities, and inability to concentrate at work failed to allege a type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it."). Without minimizing the impact that Defendants' conduct has had on Plaintiff, the Court does not find the evidence sufficient to establish the required degree of severity by clear and convincing evidence. Plaintiff presented no medical or mental health evidence or any other corroborating evidence. No other witnesses testified to the impact claimed by Plaintiff, and the Court had the opportunity to observe Plaintiff and was impressed with his demeanor, which did not reflect any emotional instability.[10]

### IV. Conclusion

For the reasons stated herein, the Court finds in favor of Plaintiff and against Defendant Gilner as to Counts I, II, and III, and awards damages as to Count I in the amount of $1,190,000, Count II in the amount of $6,555,000, and Count III in the amount of $2,185,000. The Court finds in favor of Defendant Gilner as to Count IV.

The Court will issue an appropriate Order.

/s/
Anthony J. Trenga
United States District Judge

September 25, 2012.
Alexandria, Virginia

---

[10] The evidence was equivocal in other respects. For example, with respect to his weight gain and high blood pressure, plaintiff admitted that he stopped exercising and seemed to indicate that this was one of the reasons for his weight gain and his high blood pressure. Tr. 37. As for his allegations of back and neck pain, he testified that those injuries began with a car accident in 1999. Tr. 30.